Good morning, Your Honor. I'm Matt Larson of the Federal Defender's Office for the appellant, Mr. Grant. I'll reserve two minutes for rebuttal. Your Honor, this is a straightforward case of police overreaching. The detectives' affidavit contained no facts, reasonably suggesting that the item sought in the warrant would be found in Mr. Grant's home. Now, it's the government's burden to identify facts in the warrant, making it reasonable to think that the item sought would be found there, and it hasn't carried that burden. This is clear simply by walking through the item sought with an eye to the facts listed in the affidavit. First, the gun and the bullets. There are only two references to the gun and the bullets in the affidavit. The first simply says that bullets matching either .357 or .38 caliber were found at the scene of the shooting. That says nothing about whether they would be found in Mr. Grant's home eight months later. The second reference is that Devante, one of Mr. Grant's adult sons, had been arrested and the police found a cell phone on him, and in the cell phone was a photograph of what looked like a .357 caliber gun. Again, no facts from that suggesting that the gun pictured on Mr. Devante's phone, on Devante's phone, would be found in Mr. Grant's home several months later. There simply were no facts in the affidavit reasonably suggesting that the gun or the bullets would be found in Mr. Grant's home. Secondly, Your Honors, the affidavit, the warrant sought property belonging to the victim. Now, again, it's uncontested that the only property alleged to be missing in the affidavit was the victim's cell phone. It's also clear, however, that by the time the officer applied for the warrant, the cell phone had already been located. A gentleman named Mr. Benitez had bought it from a pawn shop, apparently the pawn shop where Devante had sold it, and the police knew that the cell phone had been accounted for. Now, I think we know all this, so I think we're pretty aware of all the facts. And I would particularly like to hear the argument about United States v. Leon, because that's what the district court ruled. Indeed, Your Honor. Now, sir, do you mind jumping ahead to the Leon argument? Not at all, not at all. The good faith standard is that there has to be a colorable argument for probable cause. It has to be a reasonably well-trained officer has to think that there's an argument for probable cause in requesting a particular warrant. Well, apparently a pretty well-trained court of appeals justice thought there was. That's the problem here. A court of appeals justice did sign off on the warrant. A U.S. district judge found that that warrant was lacking in probable cause on the standard of review that's applicable in this case, which is was there a substantial basis for probable cause? So legal matter, does the fact that the judicial officer signed off on the warrant relieve the police officer of responsibility? No, Your Honor. The Malley decision by the Supreme Court makes clear that an officer has an independent duty to exercise reasonable judgment in requesting a warrant and cannot excuse an unreasonable request simply because a judge signs off on it. Now, you're not claiming that there was anything left out of this warrant that should have been in there or anything that wasn't true or anything like that. It's simply on its face it was inadequate. There was not a colorable argument or sufficient indicia of probable cause. Correct, Your Honor. All right. And the district court agreed and then said he found that four of the five Leon exceptions don't apply, but he found that the only one that could rescue this search, I mean, that would not fall within the Leon exception, is that it was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. And so he found that it wasn't, although it was insufficient, it wasn't so lacking. Did we look at that, De Novo? You do, Your Honor. You do review Judge Rueh's determination, De Novo. And I would submit, as I did in my briefs, that Judge Rueh really didn't explain his decision. He said, well, there's this continuum of probable cause from definitely there to definitely not there, and I just find that, you know, it's not clearly not there, so I'll apply the good faith exception. But he didn't actually give a reason for that other than saying, well, the judge who signed off on it, I think he's a good judge. He didn't point to any facts in the affidavit, which made it reasonable to think that the item sought would be located in Mr. Grant's home 100 miles away and eight months after the fact. Really, this is sort of the sins of the sons, Your Honors. Devante and James had been investigated by the police, but they had been investigated without success. And having hit that dead end, the police turned to their father, Mr. Grant. And in this case, it was a simple matter of police overreaching. There were no facts reasonably suggesting the items sought in this warrant were going to be found in his house. A well-trained officer should have known that, and a well-trained officer would not have submitted this warrant application. Indeed, Judge Rueh even asked counsel for the government. He said, would you have submitted this warrant to me? Would you have submitted this warrant application to me? And the government all but conceded that it would not have done so. Judge Rueh recognized that there was no probable cause. He decided to apply the good faith exception. That is the decision on review here, and I would submit under the no vote. Well, basically, there was no – I mean, you did a very good job of demonstrating they couldn't have been looking for anything of the victims because the phone had been found. They knew where the phone was, and they didn't mention anything else. There didn't seem to be anything else that was taken. So it had to be the gun they were looking for. Right? And the question is, what evidence was there in this affidavit that the gun could have been at this house? I mean, it was essentially, as far as I can tell – I mean, all the discussion – the affidavit seems to be directed at showing something about the telephone, there being a connection to the telephone, but we know there can't be a connection to the telephone. So as to the gun, the only possibility – the only connection seemed to be that the son, James – and again, it was the adult son, Devante, whose cell phone had a picture of a gun. Devante, by the time that was realized, however, was already in police custody. And what's really critical here, as a matter of fact, was that James, before he went to my client's home, had been detained by the police. There was this fracas in Darby Park. He was taken to the hospital after being wounded. The police detained him there. They didn't find anything on him. They didn't arrest him. That's the odd thing to me, was that – so the – well, he dropped a .45. Not a gun that's the subject of the search. He dropped a .45. And I can't imagine that they would have detained him and then taken him to the hospital without searching for any other guns he might have. A very reasonable conclusion. And another – he was in the hospital for a week. So if they had probable cause to believe that he – or maybe it was overnight. But if they had probable cause to believe that he had those other guns, they could have gone to his house. Because he did go to his house. They already had. They had searched his house. They had found nothing. They tested his DNA. It didn't match the DNA at the crime scene. They had searched the house of the brother, the brother who was in prison. They didn't have anything there. And several others. The theory was that he left the hospital and he went to his father's house, and that's when he took the guns there. The only conceivable situation in which James procured a gun and then took it to Grant's home was that he was treated at the hospital, the police had detained him, found nothing on him, let him go, and then as he's driving to his father's house the next morning, he somehow conjures out of thin air the gun that was pictured on Devante's phone months earlier. Now, that may be conceivable, Your Honors, but it's not reasonable. And the standard here is reasonableness. Is it reasonable to think that happened based on the facts in the affidavit? And the answer is no. Or is it more reasonable to think he went to his father's house to recover from this gunshot wound? I would submit that's entirely reasonable as well. When an individual is wounded, it's not unreasonable to think he might want to recover at his parents' home. It's also important to note he didn't live with Mr. Grant. He was an adult. He had his own place. So there's no connection between whatever sort of past James may have. There's a lot of tension in the affidavit that I didn't quite understand about your client's girlfriend, her wife, Tina Benjamin. But she has no connection to any of this other than that's where she lived. Correct. Okay. If there are no more questions, I'll reserve the balance of my time for rebuttal. Very well. I believe from the government. Good morning, Your Honors. Kristen Williams of the United States. May it please the Court. I've briefed the issue about probable cause in my briefing. But I can see that the Court's questions are directed towards the Leon and good faith issue. So that's where I'll direct my argument today. I mean, where we've gotten ourselves so far is they couldn't have been reasonably looking for the victim's belongings because the only thing they knew about the victim's belongings was the cell phone and they knew where it was. Is there anything wrong with that conclusion, that there was no victim's belongings to be looking for? Your Honor, I do agree that the affidavit itself did not note that any other belongings were known as missing. Although I do think there's reasonable inference that an individual who took something from the murder victim. But he didn't. No one thinks he did. An individual who – I'm sorry. I was speaking about Devante Hatcher, the defendant's son. And then that same individual that as the detective laid out in his affidavit, he believed that the defendant had gone with Devante Hatcher to obtain that cell phone from James Timothy Grant, again, also defendant's son. Connecting all three of these to both. Even that inference is incredibly weak. I mean, you have this telephone call where the last thing they refer to is they say he threatened me with the guns he found at the house. He told me receiving. He knows he can't do that. I already know I had that coming back. And then they say remember when he had that for a whole month. And for some reason, the inference is that that's now jumping the whole conversation to that, to back to the cell phone. I don't know why that is. Your Honor, I believe the conversation started about the cell phone. It was the mother coming there and talking to him about why the officers were questioning him regarding the cell phone. That's an awfully weak inference. I mean, you can't tell what the that is. And the last thing they were talking about was guns. Your Honor, I think the detective was reading that in the context both of that conversation, which involved, again, there was about a ten-second sort of nonverbal communication that went on immediately prior to the section that Your Honor was pointing to. But you also have to read that in the context with what the detective had seen when previously speaking to Devante Hatcher about this victim's cell phone. And that was that initially he denied he had it all, didn't know anything about it. And then once he's confronted with the receipt, suddenly he remembers that, oh, yeah, maybe I did pawn that, but it wasn't my brother, didn't have anything to do with James Timothy Grant. And I think those things, which were articulated by the detective when he's explaining how he gets to that inference, it's this sudden, spontaneous, suspicious denial of James Timothy Grant's connection to the phone. Right. But they can't be looking for the cell phone in the house. That is correct. They cannot be looking for the cell phone. And they don't articulate anything else they're looking for. That is true, Your Honor.  So it has to be the gun. Yes, Your Honor. I believe it was the gun. The question is, what's the connection to the gun? I think the connection to the gun, there are several connections. First, as I've described in my briefing, the connections between Devante Hatcher and this particular gun. It was on his phone. I think the – It wasn't on his phone. A gun of that caliber was on his phone. Yes. A gun of that caliber was on his phone and was recognized by an expert as being very consistent. So Devante may have had a connection to the homicide. Yes. But there's no facts in the affidavit that tie him to his father's house. That is correct, Your Honor, although he is in contact with his father, but there's nothing connecting him to his father's house. Right. So he couldn't have taken the guns to the father's house. There's nothing. I mean, four corners of the affidavit does not say that he took the guns to the father's house. I think that is correct, Your Honor. What the connection – It's a little over there. So – Yeah, although Devante Hatcher becomes relevant, I think, because of James Timothy Grant and the connection between – Has Devante now been arrested for this homicide? No, it's actually different of defendant's sons that was arrested, Myron Grant, I believe. A third son. A third son. So they have a hunch, but that's all they have, isn't it? I mean, that's what it kind of boils down to, and I understand they're working this case, but as I read, you kind of piece through the affidavit, and they've got a hunch, and that's it. Why is that enough? Your Honor, I don't – well, a hunch may mean it's the considerable or the colorable argument for probable cause standard, which is where we are on the good faith. I do think, however, as I described it, I think they had more than a hunch. They were laying out the entirety of the investigation. As I was going to respond a moment ago to Judge Wardlaw's question, Devante Hatcher was arrested for assault with a deadly weapon, 6-inch revolver, the same type of revolver that's seen on his phone. He is, at the time of his arrest, he is with James Timothy Grant, who fits the description of the murder suspect who lived in the house. A very, very vague description, which probably fits another million people. This is true, Your Honor, although of the suspects that the detectives were looking at, he was the best fit for it given the individuals that they were looking at. Given that they're ultimately related, that's surprising. Well, although Devante Hatcher was in some ways discounted by the detectives because he did not fit, despite also being related, Your Honor. And I think where we are here is... But the net result is that what you need to think is that Devante somehow got the gun to James and that James, months later, and having been arrested the night before and searched, and his house having been searched, and the gun not showing up in either place, went to his father's house and for some reason brought the gun there. Why he would do that, no one explains either. I mean, you'd think if he wanted to get rid of the gun, he'd get rid of the gun. And left it there, and then his father kept it for two months, for some reason, or two and a half months. And where does any of this come from? And then got rid of it because it wasn't found there. Right. I mean, he's convicted for two different guns. Yes, although one of them was a .38 special that I think the detectives believed at the time of the seizure could have been connected. They did not believe that. Oh, I'm sure they did. Anyway, I mean, it's such an unlikely set of scenarios that James got the gun. It wasn't in his house. It wasn't in his person. But somehow, between that night and the next morning, he came up with it and for some reason decided to take it to his father's house and leave it there, if he even had any connection to the gun, which is pretty flimsy to start out with. Well, if I could address two points there. One, I think James Timothy Grant, when he was released from the hospital, did not go to his father's house until the next day. We don't know where he may have gone. We don't. And we do know he associated with individuals who were in contact with the victim's cell phone immediately after the murder. We know he lived in that town. We know he was associated with the same gang that appears to be associated. It's still just so inconceivable that he was shot, he's treated for his wounds, and then he's going to drive all over town to pick up a gun to take it to his father's house? Well, I think, Your Honor, what – Why would he take it to his father's house? Well, what I take from the affidavit is that both of the defendant's sons go to their father when they're having problems or when they need something. Yeah, like he had just been shot. He needed some care. But I think, yes, although I think Devontae Hatcher had gone to his father related to help getting this murder victim's cell phone, help getting it from James Timothy Grant under the – Is that in the affidavit? That is the – Well, that's the inference from this conversation, which is a little – That is the inference from the conversation, which I think goes to the good faith of the officer who's writing this. He is explaining his – We don't know who – in that sentence, we have no idea who he is or what it is. I think – From the conversation. From the conversation, right. Well, it is true they are identified in the conversation, but in the context of the conversation, in the context of the previous conversations with Devontae Hatcher that the detective had had and the spontaneous denial of James Timothy Grant having any connection, then the connection and suddenly here comes the father who's coming in to the conversation. I mean, what's interesting is, what's disturbing about all of this, is in the end the father gets convicted of a set of guns that they had no idea that were there. And I understand it's all plain view and maybe that's the culprit here, but the net result is that, you know, if they had just said, all right, well, fine, and we made a mistake, you don't have it, goodbye, that would have been one thing. But that's not what happened here. This man is now in prison. He is actually out on bail at the moment. Well, yeah. But it's – I think you're right, Your Honor, that if there's a culprit you're looking for, it's the plain view standard here. What I think the defendant has – or the defense counsel has asked this Court to do is to do precisely the kind of close parsing of the affidavit, the comparison between the item seized and the affidavit, that is specifically what the Supreme Court recently held in Messerschmitt was not what was supposed to be done on the good faith. Actually, if you look at the facts, the underlying facts of Messerschmitt, I think that the contrast runs in the other direction. The issue with Messerschmitt was exactly what they were looking for. But the connection between the crime and the place searched was pretty tight comparatively. That is true, Your Honor. But I think one of the things that the Supreme Court was looking at when it was trying to elucidate what it means for something to be so obvious at a simple glance that it is objectively unreasonable to rely upon it because there's no colorable argument for probable cause. And that's where we are sort of on this standard on the Leon question. And I think whenever the Supreme Court talked about the misapplication of the Gros v. Ramirez case to that, it was elucidating that what it means to be something that could be seen from a simple glance. And that's contrasted with something that requires a very close parsing, which the defense counsel has presented to this Court a close parsing of individual comparisons between the item seized and the things to be searched, and the facts in the affidavit. But that isn't even the problem here. The problem here is the connection to the house at all. The connection to the house I think is described in the affidavit is the connection between James Timothy Grant and this house, the connections between the defendant himself and having accompanied Devante Hatcher to obtain the victim's cell phone, the connections between that, again, that individual Devante Hatcher and this gun, and connections to the James Timothy Grant and having the gun at the time of that cell phone. What in this affidavit supports the search of all computers found inside the residence? Your Honor, I did not defend that in my brief, and I won't defend it here. Yes, I can see why. But the district court finally says, well, all they have is suspicion. And I think that's enough for the Leon exception. When you boil everything down, that's what the district court is saying. He says, where does this fall? There's suspicion, it's not enough to issue the warrant. There's a continuum between nothing, suspicion, almost sufficient, and sufficient. And he says it's not sufficient. But he says the defense concedes there was suspicion. Is that enough for the Leon exception to apply? If we just boil it down to that, is that enough? I don't think so. Well, Your Honor, I think actually that Judge Wu went further. He said that he could understand what the officer was getting at. Well, I can understand what they're getting at. They were frustrated, and they were thinking, well, here's somebody related to this guy, and the guy was in his house, and maybe he has it. But, I mean, you know, but that doesn't make it legal. It makes it sort of understandable if you try to solve a murder and you're not worried about the Constitution. Well, Your Honor, I don't take that to be what the affidavit was saying or what the detective was saying in the affidavit. I think if he wanted to say that, he could have said it in a much shorter way, and he wouldn't have needed to explain the various steps in the investigation, as well as the indications they had where they had run into brick walls. And I think regarding Judge Wu's, what he meant by that comment, I think you have to take it in context with the suspicion comment, which Your Honor just mentioned a moment ago, and the combination of those two together. And what I think you end up with is Judge Wu saying, I think I could understand what he was getting at. I don't agree that he got there, but I think I could understand what he was getting at. I think you have Justice Turner, who could certainly understand what this detective was getting at, because he signed off on the warrant, and there's every indication that he did that appropriately, and he wasn't. You probably don't have the answer to this, and I'm just curious. Why are California Courts of Appeal justices signing warrants? I do not know either, Your Honor. I can see from the affidavit that Justice Turner had been involved in signing other warrants related to this investigation, but I don't have any information as to why he did it in this particular case. Okay. Our questions have taken you over time. Any further questions? Thank you for your argument. Thank you very much. Dr. Rebottle. Very briefly, Your Honors, on the Justice Turner point, one possibility is that Justice Turner was a friendly judge. The Malley Court recognized that sometimes a magistrate will not perform as he or she should, and I would say that this is one of those situations. I think it's evident how we're all sort of today bending over backwards to concoct a theory under which the gun could have gotten to Mr. Grant's home. And that fact alone shows that it was not reasonable to search his home for that item. I mean, and there's a further problem, which is even Picacho's home, why would it still be there? Indeed. Indeed. I think Picacho's. Right. But it was also, it's a contrast, a Leon exception, I guess, that I find curious. And basically what Judge Wood was saying is, well, you didn't get there, but I understand that you had suspicion. And I think I agree that there's suspicion in this case, and that's enough for me. And Paul Turner. Yeah. And Justice Turner. And I think the courts have made clear that mere suspicion or, as you said earlier, Your Honor, a mere hunch is not enough. I mean, in the Spoloccio decision cited in my briefs that then-Judge Kennedy wrote, the affidavit there was 157 pages long. You know, the fact that you have a lot of information or a lot of facts that you throw at a judge doesn't necessarily mean that it's objectively reasonable to search a particular person's house for a particular property. It's not about the quantity. It's about the quality. And the facts and the quality of the facts here do not make it reasonable to think that the items sought were going to be found in Mr. Grant's home. Because that's the situation, Your Honors, Judge Wood made a mistake in applying the good faith exception, and Mr. Grant's conviction has to be reversed. Thank you very much, both of you, for your arguments. An interesting question presented, and we will take it under submission.
judges: Thomas, Wardlaw, Berzon